UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

KHALFANI M. KHALDUN, a/k/a
LEONARD B. MCQUAY,

　　　　Plaintiff,

　　　　v.　　　　　　　　　　　　　　　　　CAUSE NO. 3:23-CV-436-JD-MGG

CHRISTINA REAGLE, et al.,

　　　　Defendants.

OPINION AND ORDER

Khalfani M. Khaldun, a/k/a Leonard B. McQuay,[1] a prisoner without a lawyer, filed a motion to amend his amended complaint. ECF 12. In it, he acknowledges he recently filed his signed, amended complaint at the direction of the court (*see* ECF 11), but he wishes to amend his complaint for a second time to properly name the medical care provider. He has attached the proposed second amended complaint to his motion. ECF 12-1. "Leave to amend is to be 'freely given when justice so requires.'" *Liu v. T&H Machine*, 191 F.3d 790, 794 (7th Cir. 1999) (quoting *Payne v. Churchich*, 161 F.3d 1030, 1036 (7th Cir. 1998) and Fed. P. Civ. P. 15(a)). Here, in the interests of justice, the court will grant the motion to amend.

Under 28 U.S.C. § 1915A, the court must screen the second amended complaint (ECF 12-1) and dismiss it if the action is frivolous or malicious, fails to state a claim

---

[1] The court will refer to him by McQuay throughout the body of this order, as that is the name he uses to sign his pleading. ECF 12-1 at 9.

upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. To proceed beyond the pleading stage, a complaint must contain sufficient factual matter to "state a claim that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Because McQuay is proceeding without counsel, his allegations must be given liberal construction. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

McQuay alleges various officials at the Westville Correctional Facility have been deliberately indifferent to his needs. He has sued the defendants for compensatory and punitive damages as well as injunctive relief in the form of "removing [him] from any unlawful segregation or retaliatory segregation on any administrative segregation unit" and a "transfer to Indiana State Prison or any prison general population where [he] qualifies to be housed." ECF 12-1 at 8. On November 4, 2022, McQuay was scheduled to be transported to an outside clinic, Indiana Health, in Avon, Indiana for evaluation of a cyst on his left temple and its possible removal. He alleges Lt. Bradford and Sgt. Thomas arrived in the early morning hours to secure him in the transport van using handcuffs, shackles, a belly chain, and a security black box. He was not informed it would be a long drive. Halfway into the four-hour trip, McQuay began to feel he had to urinate badly and started to beg and plead with the officers to stop for a bathroom break. He felt like his "bladder was going to rupture inside of him" and "as if he was going to die." ECF 12-1 at 3. The officers ignored his many shouted pleas; instead, they

simply laughed and turned up the air conditioning and music instead. McQuay alleges he had to urinate so badly he felt like he was in the beginning stages of a stroke, including "numbness in his legs and left arm with his toes locking up." *Id*. at 4. Once they arrived at the parking lot of the clinic, McQuay stood up and "the urine rushed from his body soaking his entire jumpsuit, socks, and shoes." *Id*. He attended the appointment covered in urine because the officers refused to let him clean up, and he felt humiliated by the experience. The specialist rushed through the appointment because of the urine, and another appointment was scheduled for the cyst to be removed.[2] McQuay remained in "constant agony" during the trip back to the prison due to his bladder. *Id*.

The Eighth Amendment prohibits conditions of confinement that deny inmates "the minimal civilized measure of life's necessities." *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (citations omitted). In evaluating an Eighth Amendment claim, courts conduct both an objective and a subjective inquiry. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The objective prong asks whether the alleged deprivation is "sufficiently serious" that the action or inaction of a prison official leads to "the denial of the minimal civilized measure of life's necessities." *Id*. (citations omitted). "Adequate . . . facilities to wash and use the toilet are among the minimal civilized measure of life's necessities that must be afforded prisoners." *Jaros v. Illinois Dept. of Corr.*, 684 F.3d 667, 670 (7th Cir. 2012) (internal quotation marks and citation omitted). The "amount and

---

[2] The medical claims related to the cyst will be discussed separately below.

3

duration of the deprivation," along with the relevant consequences, must be assessed to determine whether a deprivation is sufficiently serious. *Reed v. McBride*, 178 F.3d 849, 853 (7th Cir. 1999).

On the subjective prong, the prisoner must show the defendant acted with deliberate indifference to the inmate's health or safety. *Farmer*, 511 U.S. at 834. As the Seventh Circuit has explained, "the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (internal quotation marks and brackets omitted). "[N]egligence, gross negligence, or even recklessness as the term is used in tort cases is not enough" to assert an Eighth Amendment violation. *Hildreth v. Butler*, 960 F.3d 420, 425–26 (7th Cir. 2020). Instead, the inmate must allege "a culpability standard akin to criminal recklessness." *Thomas v. Blackard*, 2 F.4th 716, 722 (7th Cir. 2021).

Here, McQuay has alleged Lt. Bradford and Sgt. Thomas refused to let him urinate for over four hours, even though the pain was so extreme he felt like his bladder was going to rupture and he was going to have a stroke. Instead, they ignored his pleas for help and laughed at him. They subsequently refused to let McQuay clean the urine off himself at the doctor appointment and lengthy trip back to the prison, during which McQuay remained in "agony" the entire time. Afterwards, he suffered many medical issues—which will be discussed below—allegedly caused by the incident.[3] Although

---

[3] Although uncommon, serious adverse effects including bladder dysfunction, urinary tract infections, damage to urinary tract structures, and even bladder rupture can occur when urine is held too

the duration of the deprivation of bathroom facilities wasn't lengthy, the consequences were potentially serious given the state of McQuay's existing health issues and his claims of extreme pain, both of which the officers allegedly ignored. *See e.g., Reed*, 178 F.3d at 853–54 (because plaintiff was "already infirm," an alleged short deprivation "could possibly have more severe repercussions for him than a prisoner in good health"); *but cf. O'Malley v. Litscher*, 465 F.3d 799, 805 (7th Cir. 2006) (finding it was not unreasonable to deny the use of a bathroom because the defendants "did not simply ignore his need to urinate" but instead "offered him a urine bottle, and ultimately . . . relieved him through use of a catheter"). Accordingly, while later investigation may reveal that both defendants had legitimate reasons for refusing to allow McQuay to use bathroom facilities during the transport—giving McQuay the benefit of the inferences to which he is entitled at this stage—he has stated plausible Eighth Amendment claims of deliberate indifference against Lt. Bradford and Sgt. Thomas.

McQuay has also sued Christina Reagle, the Commissioner of the Indiana Department of Correction, claiming she is "ultimately responsible" for the policies that allowed him to be "transported multiple hours away without designating places that can be utilized if there is a need." ECF 12-1 at 7. He believes, "[i]f the transport officers had policy allowing them to stop at the nearest prison, police post, or any other location

---

long. *See e.g., Medical News Today*, available at: https://www.medicalnewstoday.com/articles/how-long-can-you-hold-in-your-pee#how-often-to-urinate (citing *National Institute of Diabetes and Digestive and Kidney Diseases*, available at: https://www.niddk.nih.gov/health-information/urologic-diseases/urinary-retention/definition-facts and *Science Direct*, available at: https://www.sciencedirect.com/science/article/pii/S2214442017304011) (all last visited Jan. 11, 2024). Causation issues will likely need to be further explored during the pendency of this case.

5

the Plaintiff would not have been injured." *Id*. He insists she is "responsible for training staff, and ensuring this training is being followed." *Id*.

To the extent McQuay is seeking to hold the Commissioner personally liable, he has not alleged she had any involvement whatsoever in the transport or the decisions the officers made during it, and supervisor liability is insufficient to state a claim. *See e.g., Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018) and *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) (both noting that liability under 42 U.S.C. § 1983 is based on personal responsibility and that prison officials cannot be held liable for damages solely because they hold supervisory positions). Furthermore, with regard to a failure to train theory—even putting aside the sparsity of the allegations—he may not proceed on this type of claim because "in the Eighth Amendment context, such [failure to train] claims may only be maintained against a municipality." *Brown v. Budz*, 398 F.3d 904, 918 (7th Cir. 2005) (quoting *Sanville v. McCaughtry*, 266 F.3d 724, 739–40 (7th Cir. 2001)). The Commissioner is not a municipality in either her individual or official capacity, so McQuay hasn't stated any plausible claims against her.

Turing to the medical claims, once back at the prison after the transport, McQuay immediately asked to be examined by the medical staff. Nurse K.—whom the court assumes to be defendant Danielle Krolikowski, LPN—checked his vitals and concluded "everything looked and sounded good." ECF 12-1 at 4. Even though McQuay advised her he was in "excruciating pain in my lower abdomen" and that his "stomach felt damaged," he was sent to his cell where he remained in pain. McQuay began urinating

on himself every night in his sleep. He advised "medical staff" of this issue, and lab work with twenty vials of blood was ordered. *Id.*

On November 18, 2022, two weeks after the transport incident, Dr. Liaw—a physician employed to provide medical care within the Westville Correctional Facility—attempted to remove the cyst on McQuay's left temple, but McQuay began bleeding heavily during the procedure. Dr. Liaw moved him to the triage area where he attempted to resume the extraction, but the bleeding worsened so he stitched the wound up and scheduled McQuay to see the specialist.[4] During the procedure, McQuay also told Dr. Liaw that he was "in constant pain in his lower stomach," but Dr. Liaw refused to examine him or provide any treatment for his stomach pain.

On December 6, 2022, Sandra Allen, LPN, called McQuay to medical to attempt to determine if he was retaining urine in his bladder. She inserted a catheter in his penis, but she didn't lubricate it beforehand, so it caused him excruciating pain. No urine was expelled, but he did pass several blood clots. Nurse Allen refused to do anything for the pain; instead, she sent him back to his cell with some diapers. Shortly after the procedure, his "scrotum sack started to swell uncontrollably." *Id.* at 5. On December 13, 2022, Marne Juestel, a nurse practitioner, informed him his "prostate and kidney counts were extremely high," but she took no further action. *Id.*

On December 22, 2022, during a check of his vitals, it was discovered McQuay was "close to having cardiac arrest," so he was immediately transported to Franciscan

---

[4] McQuay has a scar on his face from Dr. Liaw's attempted removal, but he doesn't allege that he is currently suffering from any sort of issues related to the cyst.

7

Health, an outside hospital, by ambulance. *Id*. There, he was diagnosed with acute kidney failure, an enlarged prostate, and bleeding of the bladder and prostate. Five to six liters of blood and urine were removed from his abdomen, and his bladder issue was treated. Afterwards, he was discharged to the Westville Correctional Facility where he was kept in the prison infirmary for observation for approximately two to three weeks. McQuay alleges Dr. Liaw, Nurse Krolikowski, Nurse Allen, and Nurse Practitioner Juestel consistently ignored his complaints of pain related to his bladder and stomach from November 4, 2022, to December 22, 2022, and that he needlessly suffered because of it.

Under the Eighth Amendment, inmates are entitled to adequate medical care for serious medical conditions. *Thomas*, 2 F.4th at 722. However, they are "not entitled to demand specific care," *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019), nor are they entitled to "the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997); *see also Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) ("The Eighth Amendment does not require that prisoners receive unqualified access to health care."). Rather, they are entitled to "reasonable measures to meet a substantial risk of serious harm." *Forbes*, 112 F.3d at 267. The court will "defer to medical professionals' treatment decisions unless there is evidence that no minimally competent professional would have so responded under those circumstances." *Walker*, 940 F.3d at 965 (citation and quotation marks omitted). This standard "reflects the reality that there is no single 'proper' way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field." *Lockett v. Bonson*, 937 F.3d 1016, 1024 (7th

8

Cir. 2019) (citation and internal quotation marks omitted). Additionally, it is not enough that a medical professional be mistaken in his or her judgment. As noted above, the deliberate indifference standard requires something "akin to criminal recklessness," *Thomas*, 2 F.4th at 722, rather than "negligence, gross negligence, or even recklessness." *Hildreth*, 960 F.3d at 425–26. Ignoring an inmate's complaints of pain or delaying necessary treatment can amount to deliberate indifference, particularly where the delay "exacerbates the plaintiff's condition or unnecessarily prolongs suffering." *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020) (citations and internal quotation marks omitted).

Giving McQuay the benefit of the inferences to which he is entitled, he has stated plausible Eighth Amendment claims against Dr. Liaw, Nurse Krolikowski, Nurse Allen, and Nurse Practitioner Juestel for being deliberately indifferent to his serious bladder, kidney, prostate and/or stomach issues from November 4, 2022, to December 22, 2022. With regard to the cyst, however, Dr. Liaw's actions during the failed removal may have been incompetent, but McQuay doesn't adequately allege he was deliberately indifferent to his medical needs such that it violated the Constitution. When the procedure began to go awry, Dr. Liaw moved McQuay to a different area to attempt it again, he stopped the bleeding by stitching up the wound, and he scheduled him to see a specialist. Although McQuay has a scar on his face and says the cyst hasn't yet been removed,[5] without more these actions don't plausibly constitute deliberate indifference.

---

[5] McQuay doesn't allege that he is currently suffering from any sort of issues related to the cyst.

9

*See Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (neither incompetence nor even medical malpractice constitutes deliberate indifference). Therefore, the claims against Dr. Liaw regarding the cyst will be dismissed.

On a related note, McQuay alleges "Centurion Medical Provider" (formally known as Centurion Health of Indiana, LLC)[6] has an "unspoken policy of denying incarcerated individuals adequate medical care, test[s] and treatment" which caused his symptoms to remain undiagnosed, untreated, and painful. ECF 12-1 at 1, 7. There is no respondeat superior liability under 42 U.S.C. § 1983, and a private company cannot be held liable for damages simply because it employed a medical professional who engaged in wrongdoing. *J.K.J. v. Polk Cty.*, 960 F.3d 367, 377 (7th Cir. 2020). A private company performing a public function can be sued under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), but only if the "unconstitutional acts of their employees . . . were carried out pursuant to an official custom or policy." *Grieveson v. Anderson*, 538 F.3d 763, 771 (7th Cir. 2008) (citations omitted). The purpose of this requirement is to "distinguish between the isolated wrongdoing of one or a few rogue employees and other, more widespread practices." *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 654 (7th Cir. 2021). To allege a viable *Monell* claim, the plaintiff must identify an official policy that caused him injury. *Grieveson*, 538 F.3d at 771. A plaintiff pursuing an official custom theory "must allege facts that permit the reasonable

---

[6] In the body of his complaint, McQuay refers to the corporate entity as Wexford Health Sources, Inc. ECF 12-1 at 7. However, his motion to amend as well as the caption of the complaint make it clear he is intending to sue Centurion.

inference that the practice is so widespread so as to constitute a governmental custom." *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017).

Here, McQuay doesn't identify an official corporate policy that caused him injury. While he claims Centurion has a custom of denying inmates proper care, he doesn't allege sufficient facts to support the existence of a widespread custom. Rather, he describes individual failings by the doctors and nurses who treated him, which does not give rise to a viable *Monell* claim. *See Howell*, 987 F.3d at 654; *Gill*, 850 F.3d at 344. This claim will be dismissed.

McQuay also complains about the two to three weeks he spent in the infirmary after he was discharged from the hospital along with the unit he was subsequently sent to. He describes the infirmary as a "small caged in holding area that contained nothing but a bed and a window." ECF 12-1 at 6. There was no water source inside the cell, so he had to rely on "incarcerated individuals working hospice to get water," and he had to defecate into a plastic bag inside a port-a-pottie. *Id*. He was denied his religious items while in the infirmary, and he couldn't wash five times a day prior to prayer during that time. After he requested his religious materials, Dr. James Jackson transferred him back to his original housing unit which McQuay describes as "unsanitary." *Id*. He claims this caused him to catch multiple infections that were eventually cured using "multiple types of antibiotics." *Id*. McQuay alleges he has had a catheter "on and off since these events occurred," but the last one was removed at the beginning of July. *Id*. at 7.

11

As previously noted, the Eighth Amendment prohibits conditions of confinement that deny inmates "the minimal civilized measure of life's necessities." *Townsend*, 522 F.3d at 773 (citations omitted). Although "the Constitution does not mandate comfortable prisons," *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), inmates are entitled to adequate food, clothing, shelter, bedding, hygiene materials, and sanitation. *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009); *Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006).

McQuay's scant allegations about his cell in the infirmary don't plausibly suggest the conditions there violated the Eighth Amendment. Although he claims he wasn't able to wash five times a day, he doesn't allege he was completely deprived of water or washing—in fact, he admits he was attended to by infirmary workers when they were available. The Seventh Circuit has held that even "restricting inmates to weekly showers does not violate the Eighth Amendment." *Conner v. Hoem*, 768 Fed. Appx. 560, 563–64 (7th Cir. 2019) (citing *Jaros*, 684 F.3d at 671). He also alleges he had to use a bedpan to defecate for the two to three weeks he remained in the infirmary, but this is not unusual in a situation involving a medically infirm patient. And, in general, while "long-term deprivations of modern toilet facilities" can potentially violate the Eighth Amendment, "temporary imposition[s]" do not. *White v. Knight*, 710 Fed. Appx. 260, 261–62 (7th Cir. 2018). The infirmary may have been sparser than he was used to in the general population, but he has not stated a plausible Eighth Amendment claim related to it.

As to the subsequent transfer back to his original housing unit, McQuay's vague allegation about the unit being "unsanitary" isn't enough to suggest he was denied life's necessities or that the conditions were serious enough to trigger Eighth Amendment protection. *See e.g., Swanson v. Citibank, N.A.*, 614 F.3d 400, 403 (7th Cir. 2010) ("[A] plaintiff must do better than putting a few words on paper that, in the hands of an imaginative reader, *might* suggest that something has happened to her that *might* be redressed by the law.") (emphasis in original).

McQuay further claims Warden John Galipeau and Captain Gary Lewis "allow[] incarcerated individuals to be denied access to cleaning materials by permitting requiring (sic) them to submit a request for cell cleaning," which "allows staff to constantly allege they have no one on the list for cleaning or only allowing one (1) or two people to use the cleaning supplies at a time." *Id*. The court cannot plausibly infer from these general allegations that Warden Galipeau and/or Captain Lewis were personally aware of the allegedly "unsanitary" conditions and deliberately turned a blind eye to them. Officials cannot be held liable for damages solely because of their positions. *See Mitchell*, 895 F.3d at 498; *Burks*, 555 F.3d at 595. More importantly, having a policy requiring inmates to request cleaning supplies doesn't violate the Constitution. *See Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (collecting cases) ("[W]e have recognized Eighth Amendment violations where prisoners are deprived of cleaning supplies and running water only in extreme circumstances.").

Additionally, as set forth above, McQuay alleges he was denied his religious materials—consisting of a "Quran, prayer rug, prayer beads, [and] Koofi (prayer

13

hat)"—and the ability to wash five times a day before prayer while in the infirmary. Prisoners enjoy a right to exercise their religion under the Free Exercise Clause of the First Amendment.[7] *Vinning-El v. Evans*, 657 F.3d 591, 592-93 (7th Cir. 2011). Nevertheless, restrictions that limit the exercise of religion are permissible if they are reasonably related to legitimate penological objectives, which include safety, security, and economic concerns. *Turner v. Safley*, 482 U.S. 78, 89-91 (1987); *see also Gonzalez v. Litscher*, 79 Fed. Appx. 215, 217 (7th Cir. 2003) ("Although it is true that an inmate's right to freely exercise his religion does not stop entirely at the prison door, that right is not unfettered.") (citing *Tarpley v. Allen County, Ind.*, 312 F.3d 895, 898 (7th Cir. 2002)).

McQuay doesn't allege any of the individual defendants personally denied him his religious materials or refused to let him wash five times a day while he was in the infirmary. In fact, he admits that Dr. Jackson—the only defendant whom he alleges was associated with the infirmary—returned him to his original housing unit after he requested the materials (where he was presumably able to obtain them). So, to the extent he is intending to hold any of the defendants personally liable, he hasn't stated a plausible First Amendment claim. *See e.g., Rowe v. Shake*, 196 F.3d 778, 782–83 (7th Cir. 1999) (recognizing First Amendment claim can arise from the conduct of individual defendants, but deprivation must be intentional); *see also George v. Smith*, 507 F.3d 605,

---

[7] The Religious Land Use and Institutionalized Persons Act (RLUIPA) also prohibits governmental entities from imposing burdens on an inmate's religious practices. 42 U.S.C. § 2000cc-1(a); *see generally Holt v. Hobbs*, 574 U.S. 352 (2015). Although money damages and injunctive relief are available under the First Amendment, only injunctive relief is available under RLUIPA. *Sossamon v. Texas*, 563 U.S. 277, 285 (2011). McQuay hasn't asked for any injunctive relief related to his religion claims—nor does he allege that he is currently being deprived of the ability to practice his religion—so the court will only analyze this claim under the First Amendment standard.

609 (7th Cir. 2007) ("Only persons who cause or participate in the violations are responsible."). McQuay also states, "Warden John Galipeau is responsible for the policy that prevented the Plaintiff from having his religious materials while in the prison's infirmary without penological interest." ECF 12-1 at 7. However, he doesn't elaborate on what this policy consisted of, how it was applied to him, or even whether he made any specific requests regarding his religious needs. Without additional details, these allegations fail to state a plausible claim. *See e.g., Bissessur v. Indiana Univ. Bd. of Trs.*, 581 F.3d 599, 602 (7th Cir. 2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.") (internal quotation marks and citation omitted).[8]

Finally, McQuay filed a motion for preliminary injunctive relief. ECF 2. "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to

---

[8] Of note, an infirmary is distinct from the general population in that it understandably focuses its penological concerns and services on the health of inmates in need of more than typical/routine medical care. Courts have recognized that inmates in segregation are permissibly subjected to far more restrictive conditions than those in general population, including being precluded from religious services and being restricted in the personal items they are allowed to have in their cell. *Lekas v. Briley*, 405 F.3d 602, 610-12 (7th Cir. 2005); *see also Payette v. Hoenisch*, 284 Fed. Appx. 348, 353 (7th Cir. 2008) (finding no constitutional violation where prison officials had removed all books—including the Bible—from inmate's cell because they believed the books to be a security concern). Similarly, it is reasonable to assume that an infirmary may restrict items or services if they interfere with the implementation of medical care. *See e.g., O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987) (restrictions that infringe on an inmate's exercise of his religion will be upheld if they are reasonably related to a legitimate penological interest, and evaluation of such restrictions is "committed to the considered judgment of prison administrators").

suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

As to the first prong, "the applicant need not show that [he] definitely will win the case." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). However, "a mere possibility of success is not enough." *Id.* at 762. "A strong showing . . . normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Id.* at 763 (quotation marks omitted). In assessing the merits, the court does not simply "accept [the plaintiff's] allegations as true, nor do[es] [it] give him the benefit of all reasonable inferences in his favor, as would be the case in evaluating a motion to dismiss on the pleadings." *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 791 (7th Cir. 2022). Instead, the court must make an assessment of the merits as "they are likely to be decided after more complete discovery and litigation." *Id.* at 792.[9] On the second prong, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with . . . injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

"Mandatory preliminary injunctions" requiring the defendant to take affirmative acts—such as transferring an inmate or providing him with additional medications—are viewed with particular caution and are "sparingly issued[.]" *Mays v. Dart*, 974 F.3d

---

[9] The Seventh Circuit has recognized the first step is "often decisive," and a court need not analyze the remaining elements when that is the case. *Univ. of S. Ind.*, 43 F.4th at 791.

810, 818 (7th Cir. 2020) (quotation marks omitted). Additionally, in the prison context, the court's ability to grant injunctive relief is significantly circumscribed; any remedial injunctive relief "must be narrowly drawn, extend no further than necessary to remedy the constitutional violation, and use the least intrusive means to correct the violation of the federal right." *Westefer v. Neal*, 682 F.3d 679, 681 (7th Cir. 2012) (citations and internal quotation marks omitted).

In his motion, McQuay mainly complains about the transport trip during which he had to hold his urine for more than four hours. He claims the defendants "showed no concern or human compassion during the entire trip." *Id*. at 3. He also alleges he is threatened with irreparable harm because he was "force[d] to exist with a catheter stuck in his penis/bladder with no certainty how long he has to live with it." *Id*. at 3–4. However, after filing his motion for preliminary injunctive relief, McQuay filed his second amended complaint,[10] which makes it clear he no longer has a catheter—the last placement was in July—and is no longer seeking permanent injunctive relief related to medical care. Rather, he seeks injunctive relief in the form of "removing [him] from any unlawful segregation or retaliatory segregation on any administrative segregation unit" and a "transfer to Indiana State Prison or any prison general population where [he] qualifies to be housed." ECF 12-1 at 8.[11] In any event, as described above, the second

---

[10] *See Beal v. Beller*, 847 F.3d 897, 901 (7th Cir. 2017) ("For pleading purposes, once an amended complaint is filed, the original complaint drops out of the picture.").

[11] He doesn't allege he is currently in segregation, only that "the staff at the prison and administration of the Indiana Department of Correction are known for targeting individuals who file complaints housing them arbitrarily on segregation." ECF 12-1 at 7. He "wants to prevent this from happening to him." *Id*.

amended complaint does not allege any plausible claims for permanent injunctive relief, so his motion must be denied because he has no possibility of success on the merits of those particular claims. *See e.g., Univ. of S. Ind.*, 43 F.4th at 791 (likelihood of success on the merits is "often decisive").

For these reasons, the court:

(1) DENIES the motion for preliminary injunctive relief (ECF 2);

(2) GRANTS the motion to amend (ECF 12);

(3) DIRECTS the clerk to separately docket the attachment as the second amended complaint (ECF 12-1);

(4) GRANTS Khalfani M. Khaldun, a/k/a Leonard B. McQuay leave to proceed against Lt. Bradford and Sgt. Thomas in their individual capacities for compensatory and punitive damages for being deliberately indifferent to his need to urinate during the transport on November 4, 2022, in violation of the Eighth Amendment;

(5) GRANTS Khalfani M. Khaldun, a/k/a Leonard B. McQuay leave to proceed against Dr. Andrew Liaw, Danielle Krolikowski, LPN, Sandra Allen, LPN, and Marne Juestel, A.P./R.N./N.P in their individual capacities for compensatory and punitive damages for being deliberately indifferent to his serious bladder, kidney, prostate and/or stomach issues from November 4, 2022, to December 22, 2022, in violation of the Eighth Amendment;

(6) DISMISSES all other claims;

(7) DISMISSES Commissioner Christina Reagle, Warden John Galipeau, Dr. James Jackson, Captain Gary Lewis, and Centurion Medical Provider a/k/a Centurion Health of Indiana, LLC;

(8) DIRECTS the clerk, under 28 U.S.C. § 1915(d), to request Waiver of Service from (and if necessary, the United States Marshals Service to use any lawful means to locate and serve process on) Lt. Bradford and Sgt. Thomas at the Indiana Department of Correction, with a copy of this order and the complaint (ECF 12-1);

(9) DIRECTS the clerk, under 28 U.S.C. § 1915(d), to request Waiver of Service from (and if necessary, the United States Marshals Service to use any lawful means to locate and serve process on) Dr. Andrew Liaw, Danielle Krolikowski, LPN, Sandra Allen, LPN, and Marne Juestel, A.P./R.N./N.P at Centurion Health of Indiana, LLC, with a copy of this order and the complaint (ECF 12-1);

(10) ORDERS the Indiana Department of Correction and Centurion Health of Indiana, LLC, to provide the full name, date of birth, and last known home address of any defendant who does not waive service if it has such information; and

(11) ORDERS, under 42 U.S.C. § 1997e(g)(2), Lt. Bradford, Sgt. Thomas, Dr. Andrew Liaw, Danielle Krolikowski, LPN, Sandra Allen, LPN, and Marne Juestel, A.P./R.N./N.P to respond, as provided for in the Federal Rules of Civil Procedure and N.D. Ind. L.R. 10-1(b), only to the claims for which the plaintiff has been granted leave to proceed in this screening order.

USDC IN/ND case 3:23-cv-00436-JD-MGG   document 13   filed 01/16/24   page 20 of 20

SO ORDERED on January 16, 2024

/s/JON E. DEGUILIO  
JUDGE  
UNITED STATES DISTRICT COURT

20