UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

LEONARD McQUAY,

Plaintiff,

v.                                         CAUSE NO. 3:23-CV-436-JD

LIAW, et al.,

Defendant.

OPINION AND ORDER

Khalfani M. Khaldun, a/k/a Leonard B. McQuay,[1] a prisoner without a lawyer,

is proceeding in this case on two claims. First, he is proceeding "against Lt. Bradford

and Sgt. Thomas in their individual capacities for compensatory and punitive damages

for being deliberately indifferent to his need to urinate during the transport on

November 4, 2022, in violation of the Eighth Amendment[.]" ECF 13 at 18. Second, he is

proceeding "against Dr. Andrew Liaw, Danielle Krolikowski, LPN, Sandra Allen, LPN,

and Marne Juestel, A.P./R.N./N.P in their individual capacities for compensatory and

punitive damages for being deliberately indifferent to his serious bladder, kidney,

prostate and/or stomach issues from November 4, 2022, to December 22, 2022, in

violation of the Eighth Amendment[.]" *Id.* Dr. Liaw, Nurse Krolikowski, Nurse Allen,

and Nurse Juestel ("the medical defendants") filed a motion for summary judgment.

ECF 98. McQuay filed a response, and the medical defendants filed a reply. ECF 121,

---

[1] The court will refer to him by McQuay throughout this order, as that is the name he used to sign
the operative pleading. ECF 12-1 at 9.

122, 123, 124, 125. Lt. Bradford and Sgt. Thomas ("the state defendants") filed a separate motion for summary judgment. ECF 103. McQuay filed a response, and the state defendants filed a reply. ECF 112, 116. Both summary judgment motions are now fully briefed and ripe for ruling. McQuay also filed a motion to reconsider the court's order denying his motion for appointment of counsel (ECF 117), which will be addressed at the end of this order.

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. To determine whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). However, a party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in its own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). "[I]nferences relying on mere speculation or conjecture will not suffice." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009).

2

## I.    *State defendants*

Under the Eighth Amendment, inmates are entitled to adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish liability under the Eighth Amendment, a prisoner must show: (1) his medical need was objectively serious; and (2) the defendant acted with deliberate indifference to his medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "Deliberate indifference occupies a space slightly below intent and poses a 'high hurdle and an exacting standard' requiring 'something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Stockton v. Milwaukee Cty.*, 44 F.4th 605, 615 (7th Cir. 2022) (quoting *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020)); *see also Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (stating that deliberate-indifference claims will fail absent evidence of "callous disregard" for inmate wellbeing). "[C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, i.e., the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005); *see also Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) (the defendants "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and must also draw the inference.") (quotation marks omitted).

The state defendants provide their own affidavits, McQuay's deposition testimony, and McQuay's medical records, which show the following facts: Around

May 24, 2022, McQuay was transferred from Miami Correctional Facility ("MCF") to Westville Correctional Facility ("WCF"). ECF 99-3 at 12-19. At the time he arrived at WCF, McQuay had a cyst on his forehead. ECF 103-1 at 76. He also had an active prescription for Flomax to reduce the swelling of his prostate. ECF 99-3 at 7-10; ECF 103-1 at 26-27. He had been taking Flomax for approximately three years because his prostate "enlarge[d] itself here and there." ECF 103-1 at 45. He continued receiving Flomax at WCF at all times relevant to this lawsuit. *See generally* ECF 99-3; ECF 99-4; ECF 99-5.

On October 18, 2022, WCF's medical staff referred McQuay for outpatient surgery for removal of his facial cyst. ECF 103-2 at 39. He was scheduled for an evaluation with Dr. Dominic Vernon on November 4, 2022, at Indiana University Health in Avon, Indiana. *Id.* at 19.

On November 4, 2022, Lt. Bradford and Sgt. Thomas were tasked with transporting McQuay to Dr. Vernon's office in Avon. ECF 103-3 at 2; ECF 103-6 at 2. Both defendants attest they were only aware they were transporting McQuay to Dr. Vernon's office regarding a cyst on his forehead, and had no knowledge of McQuay's other medical history at that time, including any knowledge of any urinary, bladder, or kidney problems. ECF 103-3 at 2-3; ECF 103-6 at 2-3.[2] Nothing in the transport

---

[2] McQuay responds "there is a genuine dispute as to the defendants being advised by the medical staff per policy on a prisoner's serious health concerns," as "the defendants had to have been advised of this plaintiffs concerns with urination once they were chosen to be responsible for the start and completion of transport." ECF 112 at 3. But McQuay provides no evidence in support of this statement, and his conclusory assertion that the defendants "had to have been advised of [his] concerns with urination" is insufficient to create any genuine dispute. *See Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017) ("Summary judgment is not a time to be coy: conclusory statements not grounded in specific facts are not enough") (quotation marks, brackets, and citation omitted). Moreover, McQuay

documents indicated McQuay had any other underlying medical condition. ECF 103-4. McQuay's transport was scheduled to depart from the prison at approximately 5:50 a.m. for an appointment with Dr. Vernon at 8:50 a.m. *Id.* The trip was scheduled to take approximately two-and-a-half to three hours both ways, meaning they would be gone from the prison for between five and seven hours, including time spent at the clinic. ECF 103-3 at 3.

On the morning of November 4, 2022, two unidentified correctional officers woke McQuay up and told him he would be going off-site for a medical appointment. ECF 103-1 at 11. The unidentified correctional officers gave McQuay approximately ten minutes to get ready for departure before escorting him to a holding cell. *Id.* At some point, McQuay used the restroom prior to being placed in the holding cell. *Id.* at 19. During the escort to the holding cell, McQuay told the unidentified correctional officers he needed to use the restroom again before the transport, and they said they would inform the transport officers of his request. *Id.* McQuay relied on those unidentified correctional officers to inform the state defendants of his request to use the restroom, but he does not think they informed the state defendants of his request. *Id.* at 11, 19, 22, 24. McQuay could not recall whether he ever informed the state defendants directly of his request to use the restroom before the transport. *Id.* at 22. Both state defendants

---

states in the next paragraph of his response that he was "not experiencing any issues with urination, kidneys, or prostate" at the time of the November 4 transport, and that these issues began only after the transport. ECF 112 at 4; *see also* ECF 112-1 at 9 ("The plaintiff's bladder was fine the day of the trip. His prostate wasn't enlarged nor [were] his kidneys in Stage II renal failure before this trip."). Accordingly, there is no genuine dispute regarding whether the state defendants had knowledge McQuay had any urinary, bladder, or kidney problems at the time of the November 4 transport.

attest they were never advised of McQuay's request to use the restroom prior to departing WCF for Avon. ECF 103-3 at 4; ECF 103-6 at 4.

At around 6:15 a.m., McQuay was escorted by the state defendants from the holding cell to the transport van, secured in the backseat, and the vehicle departed WCF for Avon. ECF 103-3 at 3. On the way to Avon, approximately two hours into the drive, McQuay began to feel a pressure building in his stomach and told the state defendants he needed to urinate, but they responded they could not stop the transport and he would have to wait until they arrived in Avon. ECF 11 at 3; ECF 103-1 at 12.[3] Pursuant to IDOC policy, the transport vehicle was not permitted to make any stops between the prison facility and the destination except in true emergency circumstances, due to safety and security concerns. ECF 103-3 at 2. Needing to urinate was not considered a true emergency, as all individuals involved in the transport were expected to urinate before they left for the trip and once they arrived at the destination. *Id.* A true emergency would have been something life-threatening, like a heart attack. *Id.* McQuay testified he began to experience pain in his body and scrotum because he needed to urinate so badly, and he began screaming and kicking in the back of the transport van to get the state defendants' attention. ECF 103-1 at 13.

Once the transport van arrived at Dr. Vernon's office and McQuay stood up to get out of the van, his bladder gave way and he urinated in his jumpsuit. ECF 103-1 at

---

[3] The state defendants both attest they never heard McQuay state he needed to urinate during the transport to Avon. ECF 103-3 at 4; ECF 103-6 at 4. But they concede that, even if they had heard McQuay, it would have been inappropriate and a security risk for them to have stopped the transport to allow McQuay to urinate. ECF 103-3 at 4-5; ECF 103-6 at 4-5. Construing the facts in the light most favorable to McQuay, the court accepts as true that McQuay told the state defendants he needed to urinate during the transport to Avon and the state defendants declined to stop the transport.

13-14. He was then escorted to a bathroom and his handcuffs were removed so he could clean himself and use the restroom. *Id.* at 14. McQuay was evaluated by Dr. Vernon, who noted the cyst was likely benign and set a plan for its surgical removal. ECF 103-2 at 23. Prior to leaving Dr. Vernon's office for the return trip to WCF, McQuay was permitted to use the restroom a second time. ECF 103-1 at 36; ECF 103-3 at 3. McQuay and the state defendants then departed Dr. Vernon's office and arrived back at WCF at approximately 1:06 p.m. ECF 103-3 at 3. The state defendants had no further interactions with McQuay after that point. ECF 103-3 at 5; ECF 103-6 at 5.

Following his return to the prison, McQuay was seen by a nurse for complaints of abdominal pain after being unable to urinate during the trip to Dr. Vernon's office. ECF 103-2 at 7-11. The nurse noted McQuay had since urinated without difficulty, his vital signs were stable, and he appeared to be in no acute distress. *Id.* McQuay testified he did not know at the time of the November 4 transport that he had any problems with his prostate or kidneys, and he believed these issues began because his bladder was damaged from holding his urine during the transport to Avon. ECF 103-1 at 10, 43-45. Because neither party disputes these facts, the court accepts them as undisputed.

The state defendants argue summary judgment is warranted in their favor because they were not deliberately indifferent to McQuay's serious medical need and, regardless, they are entitled to qualified immunity. In his response, McQuay argues the state defendants were deliberately indifferent for refusing to stop the transport to allow him to urinate despite knowing he was in "agony" from retaining his urine. ECF 112 at 5-7; ECF 112-1 at 8-11.

7

Here, no reasonable jury could conclude the state defendants acted with "a total unconcern" for McQuay's welfare "in the face of serious risks" by declining to stop the transport to allow him to urinate, as there's no evidence the state defendants knew declining to stop the transport subjected McQuay to a "serious risk of being harmed." *See Stockton*, 44 F.4th at 615; *Board*, 394 F.3d at 478. Specifically, it is undisputed that neither state defendant was aware McQuay had any medical condition that would make it unsafe to transport him for several hours without stopping to allow him to urinate. Indeed, McQuay himself testified he was unaware he had any medical issues with his prostate or kidneys at the time of the November 4 transport, and he agreed in his summary judgment response that he "was not experiencing any issues with urination, kidneys, or prostate" at the time of the November 4 transport. ECF 103-1 at 10; ECF 112 at 4; ECF 112-1 at 9 ("Plaintiff's bladder was fine the day of the trip. His prostate wasn't enlarged, nor [were] his kidneys in stage II renal failure before this trip"). Moreover, the state defendants were transporting McQuay to a doctor's appointment related to a cyst on his forehead, not any condition affecting his kidneys, prostate, or bladder, and nothing in the transport documents indicated McQuay had any such condition. And while McQuay was receiving Flomax at the time of the November 4 transport, it is undisputed the state defendants had no knowledge of this information. Therefore, even assuming McQuay complained to the state defendants of his need to urinate during the transport, the state defendants had no reason to believe McQuay's request was unique or that declining to stop the transport subjected him to any "serious risk of being harmed." *See Board*, 394 F.3d at 478; *Wester v. Doe 1*, No. 23-

CV-00918-SPM, 2023 WL 7553853, at *1 (S.D. Ill. Nov. 14, 2023) (denying an inmate the ability to urinate for less than three hours during a transport did not violate his constitutional rights even though he urinated on himself); *Castro v. Atchison*, No. 13-CV-00303-JPG-PMF, 2015 WL 7184816, at *4 (S.D. Ill. Sept. 14, 2015) (no Eighth Amendment violation where an inmate was denied a toilet for four hours during a transport and had to sit in his own urine).

In his response, McQuay argues the risk of harm was obvious because "he was forced to hold his urine for hours." ECF 112-1 at 3. But again, in the absence of any evidence the state defendants knew McQuay had any medical issue during the November 4 transport related to his bladder or the need to urinate, there's no evidence the state defendants knew or should have known forcing McQuay to hold his urine for between one and three hours subjected him to a "serious risk of being harmed." *See Wester*, 2023 WL 7553853, at *1; *Castro*, 2015 WL 7184816, at *4. McQuay also argues the risk of harm was obvious because he was screaming and begging for the state defendants to stop the transport. ECF 112-1 at 3, 8. But accepting as true that McQuay was screaming and begging for the state defendants to stop the transport, prison guards are entitled to be skeptical of such behavior, particularly when safety and security risks are in play. *See Est. of Miller by Chassie v. Marberry*, 847 F.3d 425, 428 (7th Cir. 2017) ("Rogers was not obliged to believe Miller's assertion that he had a brain tumor and a lower-bunk pass. Prisoners can be manipulative, using deceit to obtain advantages; guards are accordingly entitled to be skeptical"). Because there's no evidence the state defendants knew that forcing McQuay to hold his urine for between one and three

hours during the transport subjected him to a "serious risk of being harmed," no reasonable jury could conclude their conduct rose to the "high hurdle" of deliberate indifference. Summary judgment is therefore warranted in favor of the state defendants.

Alternatively, even assuming a reasonable jury could conclude the state defendants were deliberately indifferent to McQuay's need to urinate, summary judgment is warranted in their favor because they are entitled to qualified immunity.

"Qualified immunity protects government officials from civil liability when performing discretionary functions so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Alvarado v. Litscher*, 267 F.3d 648, 652 (7th Cir. 2001) (internal quotation marks and citation omitted). To overcome a qualified immunity defense, "a plaintiff must show the deprivation of a constitutional right, and must also show that the right was clearly established at the time of the violation." *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002) (citing *Alvarado*, 267 F.3d at 652). To show that a right is clearly established, the burden is on the plaintiff to "demonstrate that existing caselaw at the time of the events in question 'placed the statutory or constitutional question beyond debate.'" *Dockery v. Blackburn*, 911 F.3d 458, 466 (7th Cir. 2018). A violation is only clearly established where: (1) a closely analogous case establishes that the conduct is unconstitutional; or (2) the violation is so obvious that a reasonable state actor would know that his actions violated the Constitution. *Siebert v. Severino*, 256 F.3d 648, 654–55 (7th Cir. 2001). "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the

defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014).

Here, the state defendants provide numerous cases where district courts have found that denying or delaying an inmate the ability to urinate in connection with a transport for between one and three hours does not rise to the level of a constitutional violation. *See Wester,* 2023 WL 7553853, at *1; *Castro,* 2015 WL 7184816, at *4; *Walker v. Brookhart*, No. 21-CV-00110-SPM, 2022 WL 1555390, at *2 (S.D. Ill. May 17, 2022) (no constitutional violation where inmate with a medical condition causing frequent urination was forced to hold his urine for "hours" during a transport and urinated on the floor). In his response, McQuay provides no analogous case showing the state defendants' conduct was clearly unconstitutional. Moreover, the court has conducted its own research and has not identified any such analogous case. In his response, McQuay argues the state defendants are not entitled to qualified immunity because IDOC policy requires them to uphold the provisions of the United States Constitution and the constitutional violation here was "obvious." ECF 112-1 at 11-13. But the potential constitutional violation here was not "so obvious that a reasonable state actor would know that his actions violated the Constitution," as numerous district courts have found that forcing an inmate to hold his urine for several hours during a transport does not violate the Eighth Amendment. McQuay also argues it was "clearly established" in November 2022 that prison officers could not act maliciously and sadistically toward inmates in their custody. ECF 112-1 at 14. But McQuay's burden to overcome the qualified immunity defense is to show that the state defendants' specific conduct

violated a clearly established constitutional right; he cannot satisfy this burden merely by quoting the underlying legal standard. Because most or all courts that have addressed this issue have concluded that denying or delaying an inmate the ability to urinate in connection with a transport for several hours does not rise to the level of a constitutional violation, McQuay has not shown that "the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *See Plumhoff*, 572 U.S. at 778–79.

In summary, even when viewing the facts in the light most favorable to McQuay, no reasonable jury could conclude the state defendants knew that denying McQuay the ability to urinate for between one and three hours in connection with the transport subjected him to a "serious risk of being harmed." Alternatively, even if a reasonable jury could find a constitutional violation, summary judgment remains proper in favor of the state defendants because they are entitled to qualified immunity. For both of these reasons, the state defendants are entitled to summary judgment in this case.

## II.    *Medical defendants*

McQuay is proceeding against the medical defendants "for being deliberately indifferent to his serious bladder, kidney, prostate and/or stomach issues from November 4, 2022, to December 22, 2022, in violation of the Eighth Amendment."

As noted, to establish liability under the Eighth Amendment, a prisoner must show: (1) his medical need was objectively serious; and (2) the defendant acted with deliberate indifference to his medical need. *Farmer*, 511 U.S. at 834. For a medical professional to be held liable for deliberate indifference to an inmate's medical needs,

she must make a decision that represents "such a substantial departure from accepted

professional judgment, practice, or standards, as to demonstrate that the person

responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541

F.3d 688, 697 (7th Cir. 2008). As the Seventh Circuit has explained:

> [M]edical professionals are not required to provide proper medical
> treatment to prisoners, but rather they must provide medical treatment
> that reflects professional judgment, practice, or standards. There is not one
> proper way to practice medicine in a prison, but rather a range of
> acceptable courses based on prevailing standards in the field. A medical
> professional's treatment decisions will be accorded deference unless no
> minimally competent professional would have so responded under those
> circumstances.

*Id.* at 697-698. Negligence, incompetence, or even medical malpractice do not amount to

deliberate indifference. *Pierson v. Hartley*, 391 F.3d 898, 902 (7th Cir. 2004).

Furthermore, a prisoner is not entitled to demand specific care, nor is he entitled

to the "best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Where the

defendant has provided some level of care for a prisoner's medical condition, in order

to establish deliberate indifference the prisoner must show that "the defendants'

responses to [his condition] were so plainly inappropriate as to permit the inference that

the defendants intentionally or recklessly disregarded his needs." *Hayes v. Snyder*, 546

F.3d 516, 524 (7th Cir. 2008). A mere disagreement with medical professionals about the

appropriate treatment does not amount to an Eighth Amendment violation. *Ciarpaglini

v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003).

The medical defendants provide McQuay's medical records and affidavits from

Dr. Liaw and Nurse Juestel, which show the following facts: On November 4, 2022,

following McQuay's return to WCF from the cyst removal appointment, he was seen by Nurse Krolikowski for complaints of stomach pain after not being able to urinate while traveling to his appointment. ECF 99-1 at 3; ECF 99-3 at 64-68. Nurse Krolikowski noted McQuay was able to urinate without difficulty at that time and instructed him to return to sick call if his symptoms continued. *Id.*

On November 10, 2022, Nurse Krolikowski saw McQuay for complaints of being unable to control his urination while he slept. ECF 99-1 at 4; ECF 99-3 at 69-72. Nurse Krolikowski reported her observations to Dr. Liaw, who ordered that McQuay receive weekly checks of his vital signs while his symptoms continued. *Id.* McQuay also would see medical personnel daily when they delivered his medications to his cell. *Id.* Dr. Liaw attests that when an adult male of McQuay's age experiences an inability to control his urination, laboratory testing is typically required to determine the cause of the incontinence, as incontinence issues may relate to prostate, urinary tract infections, or kidney functionality issues which can best be detected through vital checks and laboratory testing. ECF 99-1 at 4. If the patient is unable to urinate, such symptoms may be relieved with a catheter, but a catheter is not necessary if the patient is able to urinate independently. *Id.*

On November 13, 2022, McQuay was seen by nursing staff for additional complaints of incontinence while he slept. ECF 99-1 at 4; ECF 99-3 at 73-75. At that time, a catheter was considered in order to allow him to urinate more easily. *Id.* McQuay was moved to a monitoring cell, but a catheter proved to be unnecessary after he was able to independently urinate to provide a testing sample. ECF 99-1 at 4; ECF 99-3 at 77-78. The

14

results of McQuay's urine test were unremarkable and did not show any signs of abnormality. *Id.*

On November 14, 2022, McQuay told Nurse Allen during the medication passing period that he heard a "pop" in his abdomen and requested an x-ray, and Nurse Allen placed an order for an x-ray that same day. ECF 99-1 at 5; ECF 99-3 at 46-47. The x-ray was conducted the next day and showed scattered bowel gas in a normal pattern and no acute process in McQuay's abdomen. *Id.*; ECF 99-3 at 136.

On November 17, 2022, McQuay was seen by Nurse Krolikowski for complaints of swelling in his legs. ECF 99-1 at 5; ECF 99-3 at 79-80. At that time, Nurse Krolikowski noted McQuay denied urinary retention and did not note McQuay complained of any other urinary issues or pain. *Id.*

On November 28, 2022, Nurse Juestel examined McQuay with respect to complaints of swelling in his legs and painful urination. ECF 99-3 at 81-84; ECF 99-6 at 2. Nurse Juestel noted McQuay had been started on water pills the week before, which had improved the swelling in his legs. *Id.* She ordered laboratory tests, including urine tests, and noted she would place an Outpatient Provider Request ("OPR") for a consultation with a urologist after she received the laboratory results. *Id.*

On December 2, 2022, Nurse Juestel received some of the test results which suggested McQuay may have issues with an enlarged prostate, urinary issues, or kidney issues. ECF 99-1 at 5; ECF 99-3 at 85; ECF 99-6 at 2. Nurse Juestel provided antibiotic medications to McQuay and ordered additional testing. *Id.* The rest of the test results were received on December 8, 2022, and Nurse Juestel then submitted an OPR

for McQuay to be seen by an offsite urologist. ECF 99-1 at 5; ECF 99-3 at 92-95; ECF 99-6 at 2-3. Nurse Juestel's OPR was submitted to the Centurion Utilization Management Group for approval, and she did not have any control over how quickly the OPR could be approved. ECF 99-1 at 6; ECF 99-6 at 3.

On December 10, 2022, Nurse Allen saw McQuay during the medication passing period and noted he did not have any complaints at that time and would continue to be monitored while waiting for a scheduled follow-up with a medical provider. ECF 99-1 at 6; ECF 99-3 at 98-99. The next day, Nurse Allen again saw McQuay and noted he was having difficulty controlling his urine overnight but had no issues with urgency or voiding his urine or feeling his bladder was full. ECF 99-1 at 6; ECF 99-3 at 100-101. She noted nursing staff would continue to monitor his condition. *Id.*

On December 13, 2022, Nurse Juestel's OPR for McQuay to be seen by an offsite urologist was approved. ECF 99-1 at 7; ECF 99-3 at 141, 149; ECF 99-6 at 3. That same day, Dr. Liaw submitted an additional OPR for McQuay to be seen by a nephrologist. ECF 99-1 at 7; ECF 99-3 at 102-105. On December 14, 2022, Dr. Liaw ordered a pre-renal diet for McQuay to treat his possible kidney issues. ECF 99-3 at 106-111.

On December 19, 2022, Nurse Allen saw McQuay for complaints of swelling in his legs and difficulty urinating. ECF 99-1 at 7; ECF 99-3 at 112-113. At that time, McQuay denied any abdominal pain. ECF 99-1 at 7; ECF 99-3 at 112-113. Nurse Allen notified Dr. Liaw of McQuay's complaints, and Dr. Liaw examined McQuay the next day. ECF 99-1 at 7; ECF 99-3 at 114-116. During that examination, Dr. Liaw noted there was no observed abnormality in McQuay's abdomen, acknowledged his prior

complaints of incontinence and urinary retention, and informed McQuay he had been

scheduled for offsite appointments with a urologist and a nephrologist. ECF 99-1 at 7;

ECF 99-3 at 114-116. Dr. Liaw ordered additional laboratory tests to measure kidney

function. *Id.*

On December 22, 2022, after the laboratory tests ordered by Dr. Liaw showed

signs of worsening kidney function, Dr. Liaw sent McQuay to Franciscan Hospital for

emergency treatment. ECF 99-1 at 7; ECF 99-3 at 119; ECF 99-5 at 65-71. Dr. Liaw's

decision was based primarily on concerns with McQuay's kidney function rather than

his urinary issues, which independent of the kidney concerns did not present an urgent

medical need at that time. ECF 99-1 at 7. The hospital physicians performed a

Transurethral Resection of the Prostate ("TURP") procedure to treat McQuay's enlarged

prostate. ECF 99-5 at 67; ECF 99-3 at 165. While McQuay was hospitalized, hospital

medical staff placed a foley catheter to allow him to urinate more easily. ECF 99-1 at 8;

ECF 99-3 at 164-66, 176-79; ECF 99-6 at 4. McQuay remained in the hospital until he was

discharged on January 7, 2023. ECF 99-1 at 7; ECF 99-3 at 152; ECF 99-5 at 65-71. Upon

McQuay's discharge, the hospital medical providers instructed WCF's medical staff to

keep the catheter in place until he could be seen for a follow up with a urologist. ECF

99-1 at 8; ECF 99-3 at 164-66, 176-79.

On January 9, 2023, Dr. James Jackson submitted an OPR for McQuay to be seen

for a follow-up appointment with a urologist. ECF 99-1 at 8; ECF 99-3 at 164-66.

McQuay stayed in WCF's infirmary with a catheter until the end of January 2023. ECF

99-1 at 8; ECF 99-4 at 116-22; ECF 99-6 at 4. On February 22, 2023, McQuay was taken

for a urology follow up, at which time his catheter was removed. ECF 99-1 at 8; ECF 99-4 at 134; ECF 99-6 at 4. However, soon thereafter, McQuay again expressed difficulty urinating, and a catheter was replaced to relieve his symptoms. ECF 99-1 at 8; ECF 99-6 at 4. McQuay continued to require a catheter to relieve his urinary retention issues on and off for the next several months. ECF 99-1 at 8; ECF 99-6 at 4. He filed this lawsuit in May 2023. ECF 1. Because neither party disputes these facts, the court accepts them as undisputed.[4]

The medical defendants argue summary judgment is warranted in their favor because they provided constitutionally adequate treatment by consistently monitoring McQuay's condition, testing his vital signs and laboratory results, providing him Flomax, sending him to a urologist and nephrologist, sending him to the hospital when his condition worsened, and following the instructions provided by the hospital physicians to keep his catheter in place. In his response, McQuay argues the medical defendants "attempted to find, locate, and treat Plaintiff's unforeseen illness," but "the bladder injury could not be located." ECF 122 at 3. He argues the medical defendants made numerous appointments instead of "acting immediately," which "delayed greater

---

[4] McQuay states in his response that he disputes a large number of the medical defendants' facts because the medical defendants delayed in providing him treatment. *See* ECF 121 at 3; ECF 123 at 3. But McQuay does not specifically dispute or provide any evidence disputing the actual content of any of these facts, and his vague assertion that the medical defendants delayed in providing him treatment is insufficient to genuinely dispute any of these facts. *See Gabrielle M. v. Park Forest-Chicago Heights, IL. Sch. Dist. 163*, 315 F.3d 817, 822 (7th Cir. 2003) ("It is well established that in order to withstand summary judgment, the non-movant must allege specific facts creating a genuine issue for trial and may not rely on vague, conclusory allegations"); *Sommerfield*, 863 F.3d at 649 ("Summary judgment is not a time to be coy: conclusory statements not grounded in specific facts are not enough").

treatment from the outside provider Franciscan Health Hospital" and caused his condition to deteriorate. *Id.* at 3-4; ECF 121-3 at 4-5.

Here, there is no evidence by which a reasonable jury could conclude the treatment provided by the medical defendants was "plainly inappropriate." *See Hayes*, 546 F.3d at 524. Specifically, it is undisputed the medical defendants treated McQuay's complaints by monitoring his vital signs, ordering an x-ray, providing him antibiotics, ordering laboratory testing, and regularly monitoring his condition while waiting for the laboratory results. Dr. Liaw attests that when an adult male McQuay's age experiences incontinence, laboratory testing is required to determine the cause of the incontinence because the symptoms may relate to prostate, urinary tract, or kidney functionality issues which can best be detected through laboratory testing. ECF 99-1 at 4. There's no evidence in the record by which a reasonable jury could conclude Dr. Liaw's decision to test for the cause of McQuay's symptoms by performing laboratory testing while monitoring his condition was "plainly inappropriate." *See Brown v. Osmundson*, 38 F.4th 545, 551-52 (7th Cir. 2022) (prison physician not deliberately indifferent for treating patient's appendicitis by monitoring and testing his condition as it worsened and sending him to the hospital only once it became necessary). And it's undisputed that, once McQuay's laboratory tests showed his condition was declining, he was referred to a urologist and nephrologist and eventually sent to the hospital for emergency treatment. *See id.* McQuay's belief that the medical defendants should have sent him for immediate treatment at the hospital without first monitoring and testing his condition amounts to a mere disagreement with medical professionals, which is

insufficient to show an Eighth Amendment violation. *See Ciarpaglini*, 352 F.3d at 331.

And even accepting as true McQuay's assertion he should have been sent immediately

to the hospital, there's no evidence to support that claim or that the medical defendants'

decision to monitor and test his condition before sending him to the hospital was

anything more than mere negligence. *See Pierson*, 391 F.3d at 902 (medical malpractice,

negligence, and even gross negligence do not equate to deliberate indifference);

*Duckworth v. Ahmad*, 532 F.3d 675, 680-81 (7th Cir. 2008) (prison physician who

misdiagnosed plaintiff and pursued treatment consistent with that erroneous diagnosis

was not deliberately indifferent). Because there's no evidence by which a reasonable

jury could conclude the treatment provided by the medical defendants between

November 4 and December 22, 2022, violated McQuay's Eighth Amendment rights,

summary judgment is warranted in favor of the medical defendants.

### III.    *Appointment of Counsel*

Lastly, McQuay has filed a motion for reconsideration of the court's order

denying his motion for appointment of counsel. ECF 117. District judges have the

discretionary authority to reconsider interlocutory orders any time before final

judgment. *See Mintz v. Caterpillar Inc.*, 788 F.3d 673, 679 (7th Cir. 2015). "The authority of

a district judge to reconsider a previous ruling in the same litigation . . . is governed by

the doctrine of the law of the case, which authorizes such reconsideration if there is a

compelling reason, such as a change in, or clarification of, law that makes clear that the

earlier ruling was erroneous." *Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 571–72

(7th Cir. 2006) (citations omitted). Reconsideration of an interlocutory order "serve[s] a

limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Publishers Res., Inc. v. Walker–Davis Publ'ns, Inc.*, 762 F.2d 557, 561 (7th Cir. 1985) (citation omitted). It should be noted that these types of interlocutory motions are generally discouraged because:

> a district court's rulings are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure, and ill-founded requests for reconsideration of matters previously decided needlessly take the court's attention from current matters and visit inequity upon opponents who, prevailing in an earlier proceeding, must nevertheless defend their position again and again.

*Cima v. Wellpoint Health Networks, Inc.*, 250 F.R.D. 374, 386 (S.D. Ill. 2008) (cleaned up).

As McQuay has been advised, "[t]here is no right to court-appointed counsel in federal civil litigation." *Olson v. Morgan*, 750 F.3d 708, 711 (7th Cir. 2014) (*citing Pruitt v. Mote*, 503 F.3d 647, 649 (7th Cir. 2007)). However, in some circumstances, the court may ask counsel to volunteer to represent indigent parties for free.

> When confronted with a request under § 1915(e)(1) for pro bono counsel, the district court is to make the following inquiries: (1) has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so; and if so, (2) given the difficulty of the case, does the plaintiff appear competent to litigate it himself?

*Pruitt*, 503 F.3d at 654.

In the order(s) denying him counsel, the court determined McQuay had made a reasonable attempt to find counsel on its own, so it proceeded to analyze the difficulty of the case and whether McQuay was competent to litigate it at the dispositive motion stage. *See generally* ECF 108; *see also* ECF 111. The court found McQuay's assertion that he had "no education in the medical field" (ECF 94 at 2) to be insufficient to warrant

counsel in light of his personal capacity and the complexity of the case. *See* ECF 108 at

2–3. In his motion for reconsideration, McQuay has included additional information—

namely, that he "suffers from chronic anxiety and severe depression and has to be

medicated to combat both illnesses."[5] ECF 117 at 2. He also claims he has "deteriorating

vision that complicates him from working to (sic) long at night" and that his placement

in restricted housing status has "slowed his work output tremendously" because it

takes two to three days to receive his research requests from the law library. *Id*.

      None of these facts can be considered "new" evidence. McQuay was privy to this

information when he filed his previous request(s) for counsel, and he hasn't explained

why he didn't include these arguments before now. The court would be well within its

discretion to deny the motion for reconsideration on that basis alone. In any event—

even taking this new information into consideration—the court doesn't find there is a

compelling reason to overturn the previous order. "Whether to recruit an attorney is a

difficult decision: Almost everyone would benefit from having a lawyer, but there are

too many indigent litigants and too few lawyers willing and able to volunteer for these

cases. District courts are thus placed in the unenviable position of identifying, among a

sea of people lacking counsel, those who need counsel the most." *Olson*, 750 F.3d at 711.

When determining whether to recruit pro bono counsel, "the difficulty of the case is

considered against the plaintiff's litigation capabilities, and those capabilities are

examined in light of the challenges specific to the case at hand." *Pruitt*, 503 F.3d at 655.

---

[5] The attached exhibits show these are not new diagnoses; he has had these issues since at least 2014. *See* ECF 117-1 at 1.

The relevant inquiry "is whether the difficulty of the case—factually and legally—exceeds the particular plaintiff's capacity as a layperson to coherently present it to the judge or jury himself." *Id.* There are no "fixed" requirements for determining a plaintiff's competence to litigate his own case, but the court should take into consideration the plaintiff's "literacy, communication skills, educational level, and litigation experience." *Id.* In the end, "[t]he inquiry into the plaintiff's capacity to handle his own case is a practical one, made in light of whatever relevant evidence is available on the question." *Id.*

McQuay doesn't explain why his anxiety and/or depression affects his ability to prosecute this case. Indeed, he admits he is "medicated" to combat the effects of those conditions. The same is true of his vision problems. He doesn't suggest he can't see; rather, he indicates he just can't work late into the night. The court can't discern any reason why working on his case only during the daytime hours would affect his litigation capabilities. With regard to the law library, he doesn't claim he is being denied all access; instead he states his output is "slowed" down, but having to wait two to three days for research requests isn't unreasonable. And, although McQuay indicates he dropped out of school in the twelfth grade, he doesn't suggest he has any sort of language or learning disability. As noted in the court's prior order:

> Despite not having a specific education in the medical filed—as can be said of almost all pro se plaintiffs—McQuay has proven he is literate and able to navigate this case. It's clear from a review of the docket that he can read and write the English language competently. McQuay has consistently participated in all stages of the litigation, has communicated effectively, follows court directions, understands the issues presented, and has filed detailed and relevant motions throughout. Of note, his amended

complaint describes the events leading to this lawsuit in vivid detail, demonstrating he has adequate personal knowledge of the relevant issues. *See* ECF 14. Additionally, he was already able to stave off a motion for summary judgment on the issue of exhaustion by filing a response including numerous pages of exhibits. *See* ECF 38; *see also* ECF 41 (order denying motion for summary judgment). McQuay has actively participated in the discovery process by filing his own discovery requests and responding to the defendants' requests as appropriate.

ECF 108 at 2–3.

With regard to complexity, McQuay now argues he is at an "extreme disadvantage" because he must respond to two separate groups of attorneys. ECF 117 at 4. However, McQuay is the master of his complaint and chose to include both sets of defendants in one lawsuit. While a case with two separate sets of defendants is arguably more complex than one with a single defendant, any current difficulties in responding to multiple motions can and have been offset by extensions of time. More importantly, as noted in the previous order:

> [McQuay] is proceeding on two groups of relatively straightforward Eighth Amendment claims: (1) against two transport officers for being deliberately indifferent to his need to urinate during the van transport on November 4, 2022; and (2) against the medical defendants for being deliberately indifferent to his bladder, kidney, prostate and/or stomach issues from November 4, 2022, to December 22, 2022. McQuay has described the transport incident in vivid detail as well as his medical issues throughout the course of this case—he knows what happened to him, how he felt, and how to communicate it to the court. He has sought discovery showing he understands the basic contours of this case, and, upon request, he is able to access his medical records (*see generally* ECF 93).

ECF 108 at 3.

Lastly, McQuay argues that, with regard to his claim against the state defendants, he doesn't have the legal or medical skills to establish causation connecting

the refusal to let him urinate during the van transport to his later bladder and kidney issues. But the court has concluded summary judgment is warranted in favor of the state defendants because (1) there is no evidence they *knew* at the time of the November 4 transport that denying McQuay the ability to urinate for between one and three hours subjected him to a "serious risk of being harmed," and, alternatively, (2) they are entitled to qualified immunity. Whether the state defendants' conduct was in fact the medical cause of McQuay's later bladder and kidney issues has no impact on either of these conclusions. Therefore, causation is not a relevant factor with regard to the state defendants' motion for summary judgment. And McQuay does not raise a causation issue with regard to the medical defendants, as it is undisputed they were not present during the transport incident he alleges to have caused his medical problems. As noted above, McQuay's filings demonstrate he is intimately familiar with his health concerns, and he was able to communicate those issues to the court appropriately. Because the causation issue did not determine the outcome of either motion for summary judgment, the court finds the issues in the summary judgment motions were not beyond the scope of McQuay's personal knowledge and general mental capacity, either factually or legally. Based on the current record, the court finds he is competent to represent himself in this case at this stage of the proceedings. Accordingly, McQuay hasn't shown that reconsideration of the court's previous order(s) denying him counsel (*see* ECF 108 & ECF 111) is warranted. The motion for reconsideration (ECF 117) will therefore be denied.

    For these reasons, the court:

(1) GRANTS the state defendants' motion for summary judgment (ECF 103);

(2) GRANTS the medical defendants' motion for summary judgment (ECF 98);

(3) DENIES Leonard B. McQuay's motion for reconsideration (ECF 117);

(4) DIRECTS the clerk to enter judgment in favor of the defendants and against

Leonard B. McQuay and to close this case.

SO ORDERED on January 13, 2026

/s/JON E. DEGUILIO
JUDGE
UNITED STATES DISTRICT COURT